**MURRAY CO. v. SIMMONS et al.**
(No. 188-3235.)

(Commission of Appeals of Texas, Section B. March 23, 1921.)

**1. Mortgages  133—Renewal deed of trust held not to include machinery.**

Where a renewal of a deed of trust, given after the mortgagor had installed machinery under a contract with the seller that it should remain personalty until paid for, did not specify the machinery, but provided that the renewal should cover the same property included in the original deed of trust, the deed of trust did not include the machinery, unless it became part of the realty as a fixture.

**2. Fixtures  19—Machinery installed under agreement that it should remain personalty held not to have become a fixture.**

Where machinery was sold to a mortgagor under an agreement that it should remain personalty and should be subject to a chattel mortgage for payment, the intention of the seller and mortgagor will control, and the machinery being such that it could be removed without damage to the realty, it did not become part of the realty under the doctrine of fixtures.

**3. Fixtures  35(2)—Machinery held removable without injury to realty.**

Where gin machinery was sold under an agreement that it should remain personalty and be subject to removal, a chattel mortgage being given for the purchase price, evidence *held* to show that it could be removed without injury to the buildings in which it was installed, so that it did not become affixed to the realty so as to become part thereof.

**4. Fixtures  19—Mortgagee not entitled to hold new machinery installed on theory that removal injured the old machinery subject to its lien.**

Where a cotton gin was mortgaged and on the mortgagor securing upon credit a steel gin stand, etc., the old frame gin stands were removed, but it did not appear that discontinuance in use injured them, the mortgagee, whose deed of trust did not specify the machinery, cannot hold the new machinery, which was subject to a chattel mortgage for the purchase price, particularly as the deed of trust did not obligate the mortgagor to keep the old machinery in repair or operation.

Error to Court of Civil Appeals of Second Supreme Judicial District.

Suit by the Jacksboro Oil and Milling Company against W. H. and C. A. Simmons and the Murray Company. A judgment for plaintiff which gave it priority over the Murray Company was, on appeal of the Murray Company, affirmed by the Court of Civil Appeals (205 S. W. 517), and the Murray Company brings error. Judgments of Court of Civil Appeals and district courts reformed, and as reformed affirmed.

Stark & Stark, of Jacksboro, and V. R. Biggers and J. J. Eckford, both of Dallas, for plaintiff in error.

Jno. P. Simpson and John D. McComb, both of Jacksboro, for defendants in error.

POWELL, J. This suit was brought by the Jacksboro Oil & Milling Company, hereinafter called the milling company, in the district court of Jack county on the 14th day of February, 1916, against W. H. and C. A.

Simmons, hereinafter called Simmons Bros., and the Murray Company. It was for recovery upon a note given by Simmons Bros. for $5,835.87, in renewal of two notes executed by them December 16, 1910, and for a foreclosure of a deed of trust given to secure this indebtedness. On December 16, 1910, Simmons Bros. owed a large debt to various creditors for gin machinery then in gins at Jean and Loving, Tex. Simmons Bros. contracted a loan from the milling company of $5,500 to satisfy pressing creditors, to be secured by a deed of trust upon their gin plants. The money was advanced, and its repayment evidenced by the two notes of December 16, 1910, due respectively on December 15, 1911 and 1912, each note providing on its face for extension by agreement, and a deed of trust was signed and acknowledged of even date with the two notes. The deed of trust was properly recorded January 27, 1911, in the real estate mortgage records of the county.

The said renewal note for $5,835.87 executed to the milling company by Simmons Bros. was dated December 10, 1915, due 30 days from its date, and by its terms specifically renewed the notes executed on December 16, 1910, and the deed of trust given on the same date. This renewal in express terms provided that the deed of trust should continue to cover the same property described in the original.

On July 2, 1913, Simmons Bros., without consulting the milling company, entered into a contract with the Murray Company for a lot of new gin machinery to be installed at Loving. This new machinery consisted mainly of a six-stand steel gin, with accessories. In part payment for said new machinery Simmons Bros. executed four notes, each for the sum of $426, maturing November 1 and December 1, 1913, and November 1 and December 1, 1914. These notes were secured by a chattel mortgage contract, executed by Simmons Bros. on July 2, 1913, acknowledged July 5, 1913, and properly filed for record as a chattel mortgage on July 12, 1913.

On August 5, 1913, Simmons Bros. purchased six steel ratcher feeders from the Murray Company, and in part payment thereof executed two notes, each for the sum of $165.75, maturing November 15, 1913 and 1914, respectively. These notes were secured by a chattel mortgage contract, similar in all respects to the first one above described in favor of the same company, executed August 5, 1913, acknowledged August 21, 1913, and duly deposited in the office of the proper county clerk as a chattel mortgage on August 27, 1913.

The proof showed that when the machinery was shipped by the Murray Company to Simmons Bros. at Loving, Tex., the bill of lading covering the shipment was mailed to a local bank, with draft attached, to be surrendered to Simmons Bros. only upon the execution by the latter of the various notes and mortgages above set out. Simmons Bros. went to the bank and executed all of said papers with reference to the Murray Company machinery. The mortgage contracts provided specifically that all the property being sold by the Murray Company to Simmons Bros. should remain personal property until fully paid for, and be subject to removal at the pleasure of the Murray Company in case of default by Simmons Bros. in the payment of the notes given for such machinery. These express contracts were signed by Simmons Bros. before they ever took possession of this machinery, or placed it upon their gin lot at Loving, Tex.

The Murray machinery was installed in the Loving gin plant. Mr. W. H. Simmons, of the firm of Simmons Bros., testified he installed it himself. In doing so, he set aside the wooden frame gin stands, some of which had been in use since 1905, and others since 1906 and 1907.

The milling company sued Simmons Bros. on their note as aforesaid, and alleged that the Murray machinery had become a part of the realty at the Loving gin plant, and was therefore covered by its deed of trust. It prayed for judgment for a priority of its lien over that retained by the Murray Company on its own machinery. Simmons Bros. confessed a judgment all around. The Murray Company asked for a judgment for its debt on the notes above described and for a foreclosure of its mortgage lien as against the milling company and Simmons Bros. It claimed its lien was in no sense junior to the deed of trust lien in favor of the milling company.

The case was tried by the court without the intervention of a jury, and no findings of fact or conclusions of law were filed. However, the court did sustain the contentions of the milling company in full, and rendered judgment for it against Simmons Bros. for the debt and a foreclosure upon both pieces of gin property. The Jean property was ordered to be sold first, and if it failed to satisfy the judgment then the Loving property was to be sold. If there was a balance from the Loving property after satisfying the judgment in favor of the milling company, it was to be applied upon the judgment rendered for the Murray Company. Judgment was also rendered in favor of the Murray Company against Simmons Bros. for its debt and a foreclosure of its lien on the machinery described in its chattel mortgage, subject, however, to the prior foreclosure in favor of the milling company.

The judgment in favor of the milling company was for $7,061.40, and in favor of the Murray Company for $2,718.52. Each of said amounts was to draw interest from March 10, 1917, the date of the judgment, at the rate of 10 per cent. per annum. Simmons

Bros. accepted the judgment, and the Murray Company alone appealed. The Court of Civil Appeals affirmed the trial court's judgment. See 205 S. W. 517.

[1] The only question at issue on this appeal is whether the milling company's deed of trust covers the Murray machinery at the Loving gin, and its lien thereunder is prior and senior to the purchase-money mortgage lien thereon in favor of the Murray Company. The deed of trust was executed about three years prior to the installation of the Murray machinery, and the latter was installed about two years before the renewal of the milling company's deed of trust was executed. The renewal did not specify the Murray machinery, but, on the contrary, specifically provided the renewal should cover the same property described in the original deed of trust. But, if the renewal had referred to the new machinery, it would not have been any more effective than the original deed of trust, for the Murray Company's mortgages were duly of record long before said renewal was executed. Consequently, the deed of trust in favor of the milling company could not have covered the Murray machinery except upon the theory that when the latter was installed it became a part of the realty and not subject to removal.

[2] Did this new machinery become a part of the realty as affecting the priority of the liens asserted by the milling company and Murray Company? We think the controlling question in determining this issue is the intention of the parties. In this case it is clearly shown that the intention of the parties was that the Murray machinery should remain chattels, and there had been no such attachment of said chattels to the realty as would injure the realty by the removal of the chattels. Consequently, as we view it, such chattels cannot be regarded as a part of the realty, and are not subject to the milling company's deed of trust as against the Murray Company's mortgage. We are sustained in this view by the following authorities: McJunkin v. Dupree, 44 Tex. 500; Hutchins v. Masterson, 46 Tex. 551, 26 Am. Rep. 286; Harkey v. Cain, 69 Tex. 150, 6 S. W. 637; Brewing Ass'n v. Mfg. Co., 81 Tex. 103, 16 S. W. 797; Connally v. Hopkins (Civ. App.) 195 S. W. 656; Hopkins v. Connally, 221 S. W. 1082; Willis v. Munger Imp. Cotton Mach. Mfg. Co., 13 Tex. Civ. App. 677, 36 S. W. 1010; Menger v. Ward (Civ. App.) 28 S. W. 824; Eaves v. Estes, 10 Kan. 314, 15 Am. Rep. 345; Tifft v. Horton, 53 N. Y. 377, 13 Am. Rep. 537; Crippen v. Morrison, 13 Mich. 24; Mundine v. Pauls, 28 Tex. Civ. App. 46, 66 S. W. 254.

A brief review of some of the above authorities may be helpful.

The Supreme Court of Texas, in the case of Hutchins v. Masterson, 46 Tex. 554, 26 Am. Rep. 286, in an opinion by Justice Moore, says:

The difficulty in determining what is an immovable fixture is due to a great degree to "the different standpoints from which the questions touching its application have been viewed, the relation of the parties regarding it, the degree of fixedness of the property involved, and the purpose or intention with which the article in question was annexed to, or placed upon the land. * * * The modern authorities," so says the learned judge, "establish the doctrine that the true criterion for determining whether a chattel has become an immovable fixture consists * * * of the following tests:

"First. Has there been a real or constructive annexation of the article in question to the realty?

"Second. Was there a fitness or adaptation of such article to the uses or purposes of the realty with which it is connected?

"Third. Whether or not it was the intention of the party making the annexation that the chattel should become a permanent accession to the freehold—this intention being inferable from the nature of the article, the relation and situation of the parties interested, the policy of the law in respect thereto, the mode of annexation, and purpose or use for which the annexation is made.

"And of these three tests, pre-eminence is to be given to the question of intention to make the article a permanent accession to the freehold, while the others are chiefly of value as evidence as to this intention. * * *

"It is also to be noted that owing to the greater relative importance and value now attached to chattels than formerly, and, in the interest of manufacture and commerce, a much more liberal rule has been adopted, in determining whether or not chattels which have been placed upon land by lessees and tenants are permanently annexed to it, than once prevailed."

The case of Willis v. Munger Improved Cotton Machine Mfg. Co., 13 Tex. Civ. App. 677, 36 S. W. 1010, is a Texas case identical with the case at bar. It decides not only that machinery thus attached remains personalty but lays down the rule as to the respective rights of a prior lienor of the realty and vendor of machinery placed thereon with a mortgage on the machinery to secure the vendor. The Supreme Court of Texas refused a writ of error in this case. In it the court says:

"Where it is clearly shown, as in this case, that the intention was that the property should remain chattel, and there has been no such attachment of the chattel to the realty as would injure the realty by the removal of the chattel, the chattel should not be regarded as a part of the realty. Hutchins v. Masterson, 46 Tex. 554; Ewell, Fixt. p. 21; Menger v. Ward (Tex. Civ. App.) 28 S. W. 824, and authorities cited; Binkley v. Forkner (Ind. Sup.) 19 N. E. 755; Eaves v. Estes, 10 Kan. 314; Tifft v. Horton, 53 N. Y. 377.

"The second assignment of error insists that as appellants held a vendor's lien upon the realty at the time the machinery was placed upon it, and the machinery was so placed without their knowledge or consent, and without any agreement on their part that it should remain

chattel until paid for, as to them it became a part of the realty. The vendor's lien notes held by Willis & Bro. were made and executed by Hildebrandt & Bohne, December 13, 1892, and on the same day transferred to said Willis & Bro. The machinery in question was bought from the Munger Machinery Company by Hildebrandt & Bohne, March 30, 1893, when the mortgage in question was executed, and the machinery was, about one month thereafter, placed upon the real estate upon which said lien existed. Willis & Bro. were fully apprised of Munger's claim to the property at the time they brought their suit to foreclose their vendor's lien, and long prior to the time of sale thereunder. The property to which the vendor's lien attached would not be injured by the removal of the machinery. The contention is that notwithstanding the machinery should be treated as personalty as between the Munger Company and Hildebrandt & Bohne, as to appellants it should be regarded as a part of the realty. We do not think this contention is based upon any sound principle. By sustaining and applying it in this case, the Munger Company would lose the security taken for their machinery, and appellants would have the value of the machinery added to the realty upon which their vendor's lien rested, without valuable consideration paid, or any damage to be done to their security by the removal of the machinery. The vendees had the right to place the machinery upon the lot without forfeiting the right of its removal, so long as it could be done without injury to the realty. As they possessed that right, they could incumber it with a mortgage to another, with such right of removal to satisfy the mortgage lien. Harkey v. Cain, 69 Tex. 150, 6 S. W. 637; San Antonio Brewing Ass'n v. Artic Ice Machine Mfg. Co., 81 Tex. 103, 16 S. W. 797; McJunkin v. Dupree, 44 Tex. 500; Campbell v. Roddy (N. J. Err. & App.) 14 Atl. 279; Binkley v. Forkner (Ind. Sup.) 19 N. E. 755; Crippen v. Morrison, 13 Mich. 24."

In the case of Connally v. Hopkins, 195 S. W. 656, the Court of Civil Appeals held that, although the gin machinery was so attached to the land and gin house as to partake of the nature of realty, said machinery retained its character of personalty so as to be within the terms of the chattel mortgage held by Connally & Co., and to subject the proceeds of the insurance thereon to the equitable rights of the chattel mortgagees. This ruling of the Court of Civil Appeals was passed upon and approved by the Commission of Appeals. 221 S. W. 1082. The latter decision was approved by the Supreme Court.

In the case of Tifft v. Horton, 53 N. Y. 377, 13 Am. Rep. 537, Tifft sold to Mrs. Brown an engine and boiler put up and used in a new elevator which she was building. Mrs. Brown executed a mortgage upon same which stipulated that the engine and boiler should remain personal property until the purchase money was paid; in case of default and foreclosure with the right to remove same. The engine and boiler were put upon a foundation outside the elevator building and a building called engine house was built over them. Prior to this time Mrs. Brown had given Horton a mortgage upon the premises. He foreclosed, took possession of the elevator, and claimed the engine and boiler. Judge Folger says in rendering the opinion:

"It is well settled that chattels may be annexed to the real estate and still retain their character as personal property. * * * Of the various circumstances which may determine whether in any case this character is or is not retained, the intention with which they are annexed is one; and if the intention is that they shall not by annexation become a part of the freehold, as a general rule they will not. The limitation to this is where the subject or mode of annexation is such as that the attributes of personal property cannot be predicated of the thing in controversy, * * * as where the property could not be removed without practically destroying it, or where it or part of it is essential to the support of that to which it is attached. * * *

"It may in this case be conceded that, if there were no fact in it but the placing upon the premises of the engine and boilers in the manner in which they were attached thereto, they would have become fixtures, and would pass as a part of the realty. But the agreement of the then owner of the land and the plaintiff is express, that they should be and remain personal property until the notes given therefor were paid; and by the same agreement power was given to the plaintiffs to enter upon the premises in certain contingencies, and to take and carry them away. While there is no doubt but that the intention of the owner of the land was that the engine and boiler should ultimately become a part of the realty, and be permanently affixed to it, this was subordinate to the prior intention expressed by the agreement. That fully shows her intention and the intention of the plaintiffs, that the act of annexing them to the freehold should not change or take away the character of them as chattels, until the price of them had been fully paid. And as the parties may by their agreement, expressing their intention so to do, preserve and continue the character of the chattels as personal property, there can be no doubt but that as between themselves the agreement in this case was fully sufficient to that end. * * *

"The general rules governing the rights of parties in chattels thus annexed to the real estate rest, as it appears, upon the presumption which the law makes of what their purpose is in the act of annexation. This presumption grows out of their relation to and interest in the land, and not from the relation or interest in it of others which may be opposite. And as the presumption of their purpose grows alone out of their relation and interest, it is repelled by whatever signifies a purpose different; not a different purpose in those holding a relation which may become hostile, but their own different purpose. Hence I conclude that the agreement of the owner of the land with the plaintiffs, as it did fully express their distinct purpose that these annexations of boiler and engines should not make them a part of the real estate, was sufficient to that effect without any

concurring intention of the defendants as prior mortgagees. * * *

"It appears that the boilers and engine cannot be removed without some injury to the walls built up about them, and which are a part of the real estate, yet this fact will not debar the plaintiffs. The chattels have not become a part of the building; the removal of them will not take away or destroy that which is essential to the support of the main building, or other part of the real estate to which they were attached; nor will it destroy or of necessity injure the chattels themselves; nor will the injury to the walls about them be great in extent or amount. So that the limitations hereinbefore stated do not apply. * * *

"It is to be borne in mind, too, that in England and in Massachusetts the rights of a mortgagee of land in the mortgaged premises are greater than in this state. He is regarded as the owner and the mortgagor in the light of the tenant. So that things annexed to the land become fixtures upon the land of the mortgagee, as it were."

In the case of Eaves v. Estes, 10 Kan. 314, 15 Am. Rep. 345, the Supreme Court says:

"Plaintiffs built a steam engine for a mill, and before it left their shop took a chattel mortgage upon it, with a stipulation that they might take possession of and remove it, whether attached to realty or otherwise. The engine was set up in the mill, which had been previously mortgaged and which was subsequently sold to defendant on foreclosure of the mortgage. Held, that the engine continued personal property, and that plaintiffs were entitled to it. * * *

"When we consider the purpose of the parties, as evidenced by the mortgage, to make the engine retain the character of a chattel, regardless of the manner of its attachment to the mill, and as the mortgage violated no principle of law, wrought no injury to the rights of any, and was in the interest of trade, we have no doubt that the engine continued to be personal property. See the cases referred to in the brief of defendants in error. It is not intended to decide that parties can by any arrangement make property either real or personal, as they may choose. It will readily be conceded that the ordinary distinction between real estate and chattels exists in the nature of the subject, and cannot in general be changed by the contention of the parties. Thus, it would not be competent for parties to create a personal chattel interest in a part of the separate bricks, beams, or materials of which the walls of a house are composed. Rights by way of license might be created in such a subject, but it could not be made alienable as chattels, or subjected to the general rules by which the succession of that species of property is regulated. But it is otherwise with things which, being originally personal in their nature, are attached to the realty in such a manner that they may be detached without being destroyed or materially injured, and without the destruction of, or material injury to, the things real, with which they are connected, though their connection with the land or other real estate is such that, in the absence of an agreement, or of any special relation between the parties in interest, they would be part of the real estate.

229 S.W.—30

* * * So in this case, if the manner of the attachment of the engine to the mill is such as to leave the mind in doubt or uncertainty as to whether it became a part of the freehold, we may look to the intention of the parties as controlling. This is constantly done in cases between landlord and tenant, where improvements for the benefit of trade are held as personalty, which, as between vendor and vendee, would pass as realty. It is said that the tenant would not have intended the improvements as an accession to the freehold, and this intention is derived solely from his limited estate in the rented property. In this case the parties have declared that the engine shall retain its character of personalty; and the facts in the case do not overcome the inference drawn from the contract. It is not an inference drawn solely from the relation of the parties, or the nature of the estate, but a positive stipulation made by the parties. The intent is not inferred from facts, or left in doubt. That intent was that the engine should continue personal property, and we think it retained that character; and therefore the judgment is affirmed."

Under the well-settled rule of law above reviewed, we have no difficulty in applying the facts of this case to reach the proper conclusion. It is sometimes difficult to arrive at the intention of the parties with reference to whether or not property shall remain personalty. No such difficulty is presented here. The intention of the Murray Company and Simmons Bros. with reference to their machinery remaining personalty and subject to removal if not paid for is not open to debate. The written contracts and mortgages specifically so provide. These provisions should govern. They show plainly that the intention of the parties was to treat the property as personalty and not as becoming a part of the realty.

[3] It is equally evident to our minds that the Murray machinery could be removed from the gin lot without damage to the realty. It was not attached to the ground at all. The undisputed proof shows the same was not attached to the gin house in such a way as to damage the house in removing the machinery. Only two witnesses were introduced on this point. The president of the milling company said he was not experienced in such matters and preferred that Simmons testify in that connection. Simmons did testify. He said:

"We got that machinery into the building by pulling it in with a block and tackle, pushed it in on rollers—I don't know how all. The condenser came in through the door. The gin stands went in at the side of the building. I believe we unloaded them off the car and brought them right through the engine room into the gin house. We pulled the other gin stands out through the door of the building. In 1910, when we gave Mr. Foxhall his mortgage, there was in that building eight wood gin stands. The floor of that gin house came flush with the sills. It did not go over the sills. It does not take much effort to unscrew those lag screws and loosen the four legs of the gin from

the sill; nothing more than just power enough to unscrew that screw, with a monkey wrench, or something like that.

"Q. Now, the old gin stands, they were connected the same way, weren't they? A. There was lag screws went down through the timber. There was a wood sill the length of two stands, in the wood. It was fastened to the sill the same way. We did not use any part of the old sills in this new stand. They were replaced, but practically the same size. We first bored a hole in the sill. After we take that lag screw out, that leaves the sill with a hole in it, just exactly as it was when we put the gin stand in and put the lag screw in there. If we take the lag screw out I think it still leaves the sill with a hole in it."

Statement of Facts, pp. 24 and 25.

It will be seen from the testimony by Simmons that the only real change made in the building in changing the machinery was the installation of new sills. It can hardly be said that that change damaged the building. If the change in machinery was made once without injury to the building, it could be done again. The property that went into the building without damaging it can certainly be removed likewise.

[4] But the milling company insists that the old wooden frame gin stands which had been in operation since the year 1905, and which Simmons set aside when he installed the new machinery, had depreciated in value by reason of their replacement. We do not think a discussion of this question essential to the decision of the case. They were not injured at the time of being removed from the gin house. But, we might say several things in reply to this contention of the milling company. In the first place, the evidence does not show they were ever damaged. Only one witness made an effort to testify on that point, and he said it was natural to suppose they may have deteriorated some by reason of their disuse, though he had not made any inspection to see. He did testify also that the wooden ones should last always. It occurs to us that a few years' rest might have helped them. At any rate, they were still there, and the milling company still had its same property which its deed of trust originally covered.

In the second place, even if the old gin stands had been damaged, the proof shows that the Murray Company had nothing to do with their removal. Simmons swears that he set aside the old gin stands and installed the new ones himself. The contract executed by Simmons and the Murray Company shows the latter only agreed that the new machinery would be installed somewhere at or near Loving, Tex. There is no testimony showing that the Murray Company even knew the old gin stands were to be removed. As a matter of fact, the proof shows that Simmons Bros. were in the habit of changing the location of their gin plant at Loving, and they might have continued the use of the old gin stands as well as the new. If the old gin property was personalty, then the Murray Company could not even be charged with constructive notice that it was mortgaged to the milling company, for the registration of a deed of trust in real estate mortgage records does not carry notice of a mortgage on chattels.

But even if the Murray Company had known that the old machinery would be set aside temporarily, and its agents had actually assisted in such work, we do not think such action would have violated any provision of the deed of trust held by the milling company. It did not provide that Simmons should continue to operate the gin, much less every piece of machinery in it. Nor did it provide Simmons should keep the old machinery in repair or in any certain place on the premises. It did not provide that he should not move the machinery around and change its location as occasion required, nor that he should refrain from installing new machinery as he thought necessary from time to time in order to efficiently operate his gin. It is doubtful if the milling company would have had any cause of complaint even against Simmons Bros. for setting aside the old gin stands. The undisputed proof shows that the president of the milling company knew about the change in machinery about January 1, 1914, just a few months after the change was made. If he felt that Simmons Bros. were permitting his security to deteriorate, he could have sued on his notes at once, as they were past due, and asked for a foreclosure in order to protect his security. He did not do so. He took no steps to keep the old stands from suffering by disuse, seeming to prefer to take the improved steel ones for which he had not paid one cent. It seems to us that he might have been satisfied with what the Murray Company had already done for him in selling to Simmons Bros., debtors of the milling company, a lot of improved machinery largely on credit, and in that way giving to said debtors a better opportunity to operate an efficient and modern plant and more quickly pay the indebtedness due to the milling company.

If the judgment of the trial court in this case, as affirmed by the Court of Civil Appeals, should be permitted to stand, the milling company would simply acquire the Murray Company's machinery without paying anything for it, and the Murray Company would be deprived of its property practically without compensation. Stripped of its frills, and the many immaterial points argued by counsel, that would be the net result of such a decision. We do not think the law would approve it, and we know it could have no basis in equity. We are unwilling to sanction or give our approval to such a rule of law. It seems to us that common justice, under the undisputed facts of

this case, requires that the Murray Company have not only its judgment for debt as rendered by the trial court, but a foreclosure of its liens, unaffected by and not subject to any lien claimed by the milling company.

Therefore we recommend that the judgments of the district court and Court of Civil Appeals awarding the Murray Company a foreclosure of its lien upon the machinery sold by it to Simmons Bros., and fully described in the chattel mortgages set up by it in its answer and cross-bill, be so reformed as to make such foreclosure prior to the foreclosure decreed in favor of the milling company, and that the judgments as so reformed be affirmed. We further recommend that the Murray Company have judgment for all costs incurred in the appellate courts.

PHILLIPS, C. J. We approve the holding of the Commission of Appeals as correct. The judgments of the Court of Civil Appeals and District Court will be reversed in so far as the lien of the plaintiff in error on the property described in its mortgage is made inferior to the lien of the Jacksboro Oil & Milling Company, and judgment will be here rendered for the plaintiff in error establishing the priority of its lien upon the machinery described in its mortgage over the lien of the Jacksboro Oil & Milling Company, and reforming the judgment of the District Court so as to award foreclosure accordingly.