## CITIZENS' NAT. BANK OF ABILENE et al. v. ELK MFG. CO.

### No. 1372—5531.

Commission of Appeals of Texas, Section A.

June 28, 1930.

Wagstaff, Harwell, Wagstaff & Douthit, of Abilene, and O. L. Parish, of Ballinger, for plaintiffs in error.

Scarborough, Ely, Brown & King, Dallas Scarborough, and Scarborough & Wilson, all of Abilene, for defendant in error.

SHARP, J.

For a partial statement of the material facts of this case, we quote the following statement from the opinion of the Court of Civil Appeals:

"Plaintiff sold to one G. B. Brown certain pieces of machinery known as burr extractors, which were placed by Brown in cotton gins owned by him at Tuscola, Taylor county, and Anson, Jones county. The contracts for the purchase of these burr extractors both provided, in substance, that until the purchase price therefor was paid in full the title and ownership thereof should remain in the seller, and that, in case of default in any payment, the owner and holder of the notes executed on the date of the sale should be entitled to declare all sums then unpaid due and payable and should have authority to take possession of said property. These contracts were entered into in the spring and summer of 1926. The machinery was delivered and installed in the two cotton gins. Thereafter, and on the 1st day of December, 1926, Brown executed to J. O. Shelton trustee

for the Citizens' National Bank of Abilene, a deed of trust to the lands upon which these cotton gins were situated. The deed of trust was to lands only, and did not mention any machinery or fixtures.

"This deed of trust was executed for the purpose of securing the bank in the payment of a note then executed in the sum of more than $24,000, and recited that that note was given in lieu of the balance of $15,938.13, on a prior note of Brown's to the bank, which prior note was fully described in a deed of trust dated March 21, 1925, and duly recorded. The $24,000 note also included the sum of about $7,200 advanced by the bank to Brown for the purpose of paying off certain indebtedness owing by Brown to the Murray Company. The deed of trust was properly placed of record.

"Thereafter, the conditional sales contract between plaintiff and Brown was filed and registered as a chattel mortgage. During the year 1927 Brown filed a petition in bankruptcy in the United States District Court for the Northern District of Texas, at Abilene, and was by that court duly adjudged a bankrupt; his estate passing into the hands of the trustee in bankruptcy for administration. In due time the defendant bank filed its claim in bankruptcy and sought a foreclosure of its deed of trust lien. The claim was allowed and the property sold. At the sale the bank and defendant H. Gieske became the purchasers, and a deed was made to them by the trustee.

"At the time of the foreclosure the plaintiff asserted a lien on the burr extractors which it had sold to Brown. By reason of the fact that the referee in bankruptcy was disqualified to pass on the priority of the liens as between the plaintiff and the defendants, it was agreed by all parties that the plaintiff would have a right to bring suit in the district court of Taylor county to establish the validity of its lien, if it had a lien; and it was further agreed that if its lien was established it would be foreclosed on the respective pieces of machinery sold by it to Brown, and that, should it prevail, a reasonable rental value should be paid for the use of the machinery during the ginning seasons of 1927 and 1928. The sale of the property through the bankrupt court by reason of the facts above stated was made without prejudice to the rights of plaintiff to establish its lien in the state court.

"The instant suit is a consolidation of two suits brought by the plaintiff, the one concerning the Tuscola property and the other the Anson property. By its suit plaintiff is seeking to establish its title to, and right to possession of, the particular machinery sold by it to Brown, and is claiming rents for the use of the machinery. Alternatively, plain-

tiff is suing for damages for the conversion thereof by the defendants. The case was tried before the court without the aid of a jury and judgment was entered for the defendants. No findings of fact or conclusions of law appear in the record." 18 S.W.(2d) 747.

The undisputed facts show that G. B. Brown executed a deed of trust dated December 1, 1926, to J. O. Shelton, trustee for the Citizens' National Bank of Abilene, and gave a lien upon certain lots or tracts of land described as follows: Lots Nos. 12, 13, and 14, in block 46, in the town of Tuscola, Taylor county, Tex.; a part of block No. 169, and lots Nos. 5 and 6 in block No. 170, in the town of Anson, Jones county, Tex., together with all and singular the rights and appurtenances thereto in any wise belonging. That a deed of trust lien was given upon the foregoing property to secure the payment of a certain indebtedness due the Citizens' National Bank of Abilene in the sum of $24,265.10; that this amount represented a note executed by G. B. Brown of that date and was given in lien and extension of a certain indebtedness in the sum of $7,171.48, due by G. B. Brown to the Murray Company, as evidenced by certain notes theretofore executed by the said Brown to the said Murray Company, and the further sum of $15,938.13, evidenced by a note executed by Brown payable to the bank. It was further admitted that Brown was the owner of the lots above described and had been the owner thereof since the 14th day of May, 1923, and that the bank, at the time Brown executed the deed of trust to Shelton, trustee, for the bank, advanced that amount of money to take up the indebtedness that the said Brown owed the said Murray Company for gin machinery; that the deed of trust dated the 1st day of December, 1926, above described, was recorded in Taylor county on the 2d day of December, 1926; that the said G. B. Brown owned two gins, one located in the town of Tuscola, in Taylor county, and one in the town of Anson, Jones county; that G. B. Brown gave an order to the Elk Manufacturing Company, dated April 24, 1926, for one Elk Burr Extractor and executed therefor two notes, each for the sum of $1,100, one due December 1, 1926, and the other due December 1, 1927. The order contained the following:

"Said machinery, upon its receipt will be located at or near Anson in the county of Jones, State of Texas.

"It is the condition of this sale and purchase that until the purchase price is paid in full, together with the interest and any cost incurred in the collection thereof, that the title and ownership of said property shall be and remain in the Elk Manufacturing Company."

That G. B. Brown gave an order for machinery to the Elk Manufacturing Company, dated June 17, 1926, for one Elk burr extractor, and executed therefor two notes, one for the sum of $850, due January 1, 1927, and one for the sum of $850, due January 1, 1928, and containing the same stipulations as are contained in the foregoing order, which have already been set out, except that this machinery will be located at or near Tuscola, in Taylor county, Tex. It was further agreed that the foregoing deed of trust was filed for record in Jones county on December 6, 1926, and that on or about the 1st of August, 1927, G. B. Brown filed a petition in bankruptcy in the federal court at Abilene and was adjudged a bankrupt; that at that time Brown had not conveyed the title to the property above described and same passed to the trustee in bankruptcy and charged with whatever liens that were against it. In due time the foregoing mortgage was foreclosed in said court and deed executed by the trustee in bankruptcy and approved by the court to the property, and same was conveyed to the Citizens' National Bank and to H. Gieske.

The testimony further tends to show that G. B. Brown had been in the ginning business for thirty-five or forty years and was the owner of several gins; that the burr extractors involved in this suit were put in the gins to improve the service, and most of the gins in this country had begun to install them; that the burr extractors were very heavy and weighed something like 9,000 pounds, and that a platform about twenty or thirty feet across the center of the building was built to take care of this machinery and cleaning system. They were heavy machines and required substantial support. There was testimony to the effect that the machines, or part of them, were nailed or screwed to the platform; that there was also another equipment that carried the refuse out of the gin, which was connected with the burr extractor, and the hulls from the extractor went through a chute or conveyor out of the building; that this machine stands on a platform which goes down and connects with the floor and is held up by heavy pieces of timber of some kind. The burr extractor is driven from the line shaft which is connected with the engine. When the extractor was installed an additional wheel for belts was made. This machine operates from a pulley from a counter shaft under the platform; that it is operated with a belt on a pulley, which operates with two belts, one on each end of the machine.

The agent of the Elk Manufacturing Company testified substantially as follows: "This burr extractor works on each side of this cleaner. You take a gin and install this burr extractor, you would have to raise this 19 inches. You have to build a platform; these cleaners are supported by a platform. This machine comes in five sections. It is put together by bolts, etc. The extractor sets on

a level with the cleaner. The cleaner is 60 inches wide, 47½ inches high, and the same length as the extractor, 8 feet long. The weights of the different sections vary because they are built of wood. Our shipping weight is 9070 pounds. I noticed this plant at Anson, in order to level the machine they put in two blocks, 2x4 blocks, and they toe nailed this machine to the 2x4 blocks. They had to build a platform for this machine, and had to build a good substantial one. Nine Thousand pounds is pretty heavy weight, and then the other cleaning equipment runs it on up. If they didn't have this they wouldn't have to have such a large platform. The additional platform to sustain this heavy machinery had to be put in for the equipment. When they connect this burr machine it is connected for the purpose of operating it in connection with the other machinery and it becomes a unit in a complete plant. Anyone going in and looking at the gin plant, I judge would consider the burr extractor machine a part of that gin plant. If this machine is taken out of there, to accomplish that work it will require the installation of other machines, some kind of equipment. With the power shaft that goes out there to run the machinery they have the wheels put at the right place to take the belt and run the machines. That counter shaft is connected some way. They have to have something to rest on because there is a good deal of power applied through that shaft and you want to avoid all the vibration you can. I don't know what kind of supports they have under the floor, they put in to install this machine." There was testimony to the effect that this machinery was connected with the other machinery constituting the gin plant, and that, if it were removed, it would result in injury to the building, and that it would require readjustment to the balance of the equipment to do any ginning and that would be expensive.

The Court of Civil Appeals further says: "The sole question of law to be determined is whether the several pieces of machinery sold by plaintiff to Brown became fixtures, as between the parties hereto, so that they passed by the deed of trust and trustee's deed to the defendants."

In Thompson on Real Property, vol. 1, the following recognized rules are laid down:

(a) "Things of a personal nature which have been so fixed to land, or to buildings or other structures upon the land, as to become a part thereof, are termed 'fixtures,' and pass with the land in any transfer of ownership, whether this be by absolute deed or by mortgage, without any express mention of them. The term includes everything which has been attached to the land or structures thereon with a view of enhancing the value of the realty, and for the purpose of being permanently used in connection therewith, and such purpose is to be inferred from the nature of the things affixed, the relation and situation of the parties interested, the policy of the law in respect thereto, the mode of annexation, and the purpose or use for which they are made." Section 135, p. 156.

(b) "The intention which controls is, 'not the secret design which may dwell in a party's mind, and as to whose existence he alone can speak, but the intention which was either expressly declared by the parties competent to make it the governing rule, or which flows, patent to all, from the nature and character of the act, the clear purpose to be served, the manifest relation which the articles bear to the realty, and the visible consequences of their severance upon the proper and obvious use of it.' The intention must be such as is indicated by the proven facts, and circumstances, including the relation, the conduct, and the language of the parties, and not the unrevealed secret intention. It must be a legal intention on the part of the person making the annexation, as distinguished from his secret intention unmanifested by his acts." Section 129, p. 164.

(c) "If the article is retained in place by the force of gravity, without any fastening, it has sometimes been held to be insufficient annexation, but the more modern cases generally regard this as sufficient, provided the intention to make the article a part of the realty plainly appears and the article or structure is of sufficient weight that gravity will keep it in place without the aid of fastening." Section 153, p. 185.

(d) "The weight of authority is to the effect that a vendee who purchases the land subsequent to annexation of the fixture, and who has no notice of an agreement between the owner of the land and the owner of the article annexed that it shall retain its personal character and be subject to removal at the pleasure of the latter, is not affected by such agreement." Section 158, p. 193.

(e) "When, however, the vendor sells machinery, which it is well understood may, and, in the absence of agreement, does, become part of the realty by being so attached that it cannot be removed without injury, and thereby places it in the power of his vendee to so attach it, and sell or mortgage to innocent third parties, the better and more just rule is that he must suffer." Section 159, p. 195.

(f) "The authorities generally agree that machinery which is permanently attached to the realty, such as boilers, steam engines, and gearing, are parcels of, the realty, and will pass to the purchaser by a deed of the land." Section 202, p. 279.

■ The courts of this state have held, and it now seems to be the accepted rule, that the conveyance of land by deed containing no reservation of fixtures passes title thereto to the purchaser, regardless of a parol verbal sale or disposition of such fixtures. Brown

v. Roland, 92 Tex. 54; 45 S. W. 795; Potter v. Mobley (Tex. Civ. App.) 194 S. W. 205; Alexander v. Anderson (Tex. Civ. App.) 207 S. W. 205.

The honorable Court of Civil Appeals relies upon the case of Murray v. Simmons (Tex. Com. App.) 229 S. W. 461, 462, as being decisive of this case. In our judgment, the court misconstrued the holdings in the Simmons Case in so far as they apply to the facts of this case and reached an erroneous conclusion. In our judgment, the facts in the case at bar are easily distinguished from the facts in the Simmons Case. We have already copied herein the provisions contained in the order executed by Brown to the Elk Manufacturing Company for the purchase of the machinery involved herein. In the Simmons Case the substantial contents of the instrument involved therein are stated by the court as follows: "The mortgage contracts provide specifically that all the property being sold by the Murray Company to Simmons Bros. should remain personal property until fully paid for, and be subject to removal at the pleasure of the Murray Company in case of default by Simmons Bros. in the payment of the notes given for such machinery. These express contracts were signed by Simmons Bros. before they ever took possession of this machinery, or placed it upon their gin lot at Loving, Tex."

It must be borne in mind that the instrument involved in the Simmons Case was filed for record soon after its execution, and it is conceded that the milling company knew of its contents and was in no manner misled by reason thereof to its injury. In other words, the milling company never lost anything by reason of the property being installed and the contract executed with reference thereto, and in no way was its security impaired.

In the case at bar the machinery involved in this suit was installed and became an integral part of the ginning plant and was specially adapted for the uses and purposes to which it was put. The contract executed by Brown merely recited that the title was to remain in the seller. It did not undertake to comply with article 5498, R. S. 1925.

■ Besides, the contract in this suit was not recorded until long after the Citizens' National Bank had renewed its loan and furnished an additional sum of money to the extent of $7,100 or more, without any notice or knowledge of the claim of the Elk Manufacturing Company. The bank took its mortgage lien on the land upon which the gin plants were located, and the trustee in bankruptcy sold the property which was purchased by the bank and Gieske. The deed conveyed all the rights held by the bank at the time it took its deed of trust without notice or knowledge of the claim of Elk Manufacturing Company. It is a well-recognized rule that while, as between the parties to the contract or mortgage, the character of the property may be fixed by contract to the effect that it shall remain personalty and not become attached to real property and may be removed, such is not the provisions of the contract in this case. The bank was not a party to the contract between Brown and the Elk Manufacturing Company and was not affected with the provision contained therein that the seller would retain title thereto until paid for and was without notice or knowledge of it. As against Brown and the Elk Manufacturing Company the bank took its mortgage in good faith and without notice and had the right to view the property in accord with its apparent condition and character at the time it accepted the mortgage and advanced the additional money thereon.

■ In 1917 the Legislature of this state, in enacting article 5498, R. S., made provisions for protecting the rights of any person or company selling machinery or other manufactured article susceptible of being attached to the realty in such a way as to become a fixture thereto, and required that the realty upon which it is to be located or situated should reasonably be described sufficient to identify said realty, and that such instrument should be registered under the provisions of said act. If the Elk Manufacturing Company had complied with the law, its interests would have been protected. Having failed to do so, and the bank's interests having intervened, it is not now in a position to complain. In the case of Consolidated Garage Company v. Chambers, 111 Tex. 293, 231 S. W. 1072, 1074, the Supreme Court, in passing upon a similar question, in an opinion by Judge Pierson, aptly and tersely states the rule as follows:

"By the statutory law of this state a reservation of the title in chattels commonly known as a conditional sale is expressly declared to be a mortgage and subject to all the requirements of law relating to mortgages. Also the policy of this state is expressed by our statutes (articles 5654 and 5655, Vernon's Sayles' Texas Civil Statutes) that a mortgage of chattels, including conditional sales, is void as against third persons innocently purchasing the property for value, unless it is duly registered as provided therein.

"Plaintiff in error insists that it is a hard rule to deprive him of his reservation of title or lien upon the property without any negligence on his part. Also it is a hard rule to deprive an innocent purchaser for value of the property when he has been at no fault. The difference between them is this: While it works a hardship upon the mortgagee, yet he trusts the property to the possession of the mortgagor, and thereby puts it within the power of the mortgagor to dispose of the property to one who has no notice of his claim.

The mortgagee takes the risk incident to such possession, and, while he has done no wrong and may not be negligent in regard to trying to protect his rights in the property, yet he makes it possible for a third person to be defrauded if it should be held that the rights of the third person are subject to his prior claim, of which said purchaser has no knowledge or notice.

"An innocent purchaser for value has no means of protection whatever against a private or secret unregistered reservation of title in chattels, whether made in this state or out of it.

"We think these principles are fundamentally correct and conduce to less injustice than the contrary doctrine, and are clearly in consonance with our statutes and the settled policy of our state."

In 26 Corpus Juris, p. 681, § 47-b, the well-recognized rule is laid down as follows: "By the weight of authority, a subsequent purchaser or mortgagee of the land without notice of the agreement is not affected thereby, a view which is based, in some of the cases, and to some extent, upon the theory that the beneficiary under the agreement consented to the annexation of the article to the land, or had reason to know that such annexation would be made, and thereby aided in clothing the vendor or mortgagor of the land with the apparent title. But in a few jurisdictions the rule appears to be otherwise, and a subsequent purchaser or mortgagee cannot claim the articles annexed, although ignorant of the agreement by which they were to retain their personal character. In any state, however, in which the statute requires a conditional sale to be filed or recorded in order to be effective as against a subsequent purchaser, an innocent purchaser of the land to which the articles have been annexed will be protected as against an unrecorded conditional sale of the article before annexation."

It will be observed that the text above cited is supported by opinions from many states, including those from Texas, and we think it states the sound rule.

Tested by the foregoing rules laid down by the text-writers and authorities, we find no difficulty in distinguishing this case from the Simmons Case. The case was tried below before the court without the aid of a jury. No findings of fact are contained in the record, but judgment was rendered in favor of the defendants. It is to be presumed that, in support of such judgment, all facts were found in favor of the defendants which have any support in the evidence. In our opinion, the evidence supports the judgment of the trial court. We are further of the opinion that the Court of Civil Appeals erred in holding that, as a matter of law, the burr ex-

tractors as between the parties to the suit constitute personal property and not fixtures, and that they did not therefore pass to the defendants under the deed of trust and trustee's deed.

Accordingly, for the reasons herein stated, we recommend that the judgment of the Court of Civil Appeals reversing the judgment of the trial court be reversed, and that the judgment of the trial court be in all respects affirmed.

CURETON, C. J.

Judgment of the Court of Civil Appeals is reversed, and that of the district court is affirmed, as recommended by the Commission of Appeals.